IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID V. MAYO, individually and on behalf of others similarly situated,** : : : | |
| v. | : CIVIL ACTION NO. 21-2964 |
| **TITLEMAX OF DELAWARE, ET AL.** : : : | |

**McHUGH, J.**                                                                                                                        **January 4, 2022**

**MEMORANDUM**

Plaintiff brings this action under a variety of consumer protection statutes challenging the high rate of interest Defendant TitleMax of Delaware charged him for an auto loan. Plaintiff physically secured the loan at one of Titlemax's offices in Delaware, though his car is registered and garaged in Pennsylvania. The Third Circuit has previously held that Pennsylvania's strong interest in protecting its citizens against usurious interest warrants the application of Pennsylvania law in such a case. *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616 (3d Cir. 2009). Defendants here move to dismiss, relying in part upon a choice-of-law provision favoring Delaware law, but more broadly on the ground that application of Pennsylvania law would violate the dormant Commerce Clause of the Constitution. The individual defendant, Titlemax President Tracy Young, separately challenges the claims against him on personal jurisdiction grounds and for failure to state a claim. For the reasons set forth below, I will deny Defendants' motion as to the state law and TILA claims. I will, however, grant the motion as to the claims against Defendant Young, but without prejudice should discovery establish a proper basis for a claim against him.

**I.     Factual Background**

Plaintiff asserts claims under the Loan Interest and Protection Law (LIPL) and the Unfair Trade Practices and Consumer Protection Law (UTPCP), in addition to federal racketeering and

consumer lending statutes, the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Truth-in-Lending Act (TILA).

Except for the alleged involvement of Mr. Young, the parties largely agree on the core facts at issue in the operative Amended Complaint. Defendant TitleMax is a Delaware based lender, operating out of brick-and-mortar stores, that makes personal loans secured by liens on title to a consumer's motor vehicle. Despite its physical stores being located in Delaware, TitleMax makes a significant number of loans to Pennsylvania consumers. Am. Compl. ¶¶ 8-10, ECF 7.

Plaintiff David V. Mayo is a resident of Pennsylvania who took out a loan from TitleMax that was secured against the title to his car. In April 2021, Plaintiff took out a loan from TitleMax for $7,751.39 at a 132.01% APR paid over the course of 48 monthly installments. Loan Agreement at 3, ECF 7-5. This is far in excess of the 6% maximum lawful interest rate permitted by Pennsylvania law for small-dollar loans to consumers. 41 P.S. § 201. He applied for the loan at a physical TitleMax location in Wilmington, Delaware. Am. Compl. ¶ 23; Loan Agreement at 2. Plaintiff's loan agreement contains a Delaware choice-of-law provision. Loan Agreement at 6 ¶ 22. The Loan Agreement lists Plaintiff's address in Pennsylvania. *Id.* Plaintiff makes payments on the loan from Pennsylvania. Am. Compl. ¶ 30. The car is kept in and principally used in Pennsylvania where Plaintiff lives, Am. Compl. ¶¶ 18, 28, it is titled, registered, and licensed in Pennsylvania, Am. Compl. ¶ 17, and TitleMax recorded a lien with the Pennsylvania Department of Transportation on the car, Am. Compl. ¶ 29. If Plaintiff defaults on his payment schedule, TitleMax retains the right to repossess the car. Loan Agreement at 5 ¶ 12.

There is some dispute over the facts surrounding Plaintiff's actual signing of the loan that relate to the TILA claim, which at the present juncture must be construed in favor of the Plaintiff. According to the Complaint:

> TitleMax hid the terms from Mr. Mayo when he took out the loan. The TitleMax loan officer prepared the loan agreement on a computer located at a counter in the TitleMax office. The computer screen was facing the loan officer, not Mr. Mayo. The loan officer had Mr. Mayo accept the agreement on the computer, but the loan officer did not turnover control of the computer to Mr. Mayo so he could see the entirety of the agreement he was accepting. TitleMax did not let Mr. Mayo see the disclosure of the annual percentage rate, finance charge, total payments, or payment schedule.

Compl. ¶ 23.

## II. Legal Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

### A. Pennsylvania Law Applies

In *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616 (3d Cir. 2009), the Third Circuit applied Pennsylvania's choice-of-law test to determine that Pennsylvania law applied to an auto title loan made by a Delaware lender to a Pennsylvania consumer, despite a Delaware choice-of-law clause, because of Pennsylvania's interest in enforcing its usury laws. This decision was made on facts almost identical to the facts before me today. As in *Kaneff*, Pennsylvania "is where [the Plaintiff] lives … Pennsylvania is also the location of the collateral, Plaintiff's car, and [Defendants would be] required to enter Pennsylvania in order to repossess the car … [and] Pennsylvania will have to live with the aftermath of the transaction." *Id.* 623. And, again, as in *Kaneff*:

> (1) the loan agreement (a) was entered into and signed in Delaware by a Delaware corporation and a Pennsylvania resident who drove 30 miles to Delaware to obtain the loan, (b) requires repayment in Delaware and (c) provides that the agreement shall be "construed, applied and governed" by Delaware law, (2) the lender (a) is incorporated in Delaware, (b) is licensed and regulated in Delaware by the Delaware State Bank Commissioner and (c) has its only offices in Delaware.

*Id*.  The Third Circuit applied § 187(2) of the Restatement (Second) of Conflict of Laws which asks whether applying the law of Delaware "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Id.* at 621 (quoting § 187(2)).  The Third Circuit determined that "Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply Pennsylvania law." *Id.* 624.

Defendants' primary rejoinder to the application of *Kaneff* is that the Third Circuit considered only what law should be applicable to determining the enforceability of the parties' arbitration agreement, not whether the statutory Pennsylvania interest limit of 6% should have applied to the substantive usury claim.  Def. Br. at 18-19.  Although I agree that the Court of Appeals was careful to limit its holding to the "determination of the particular issue," as provided for in the Restatement, it is hard to take seriously Defendants' argument that Pennsylvania's "fundamental policy" against usurious lending would be deemed dispositive in determining enforceability of an arbitration clause, but not the substantive legal issue of the legal rate of interest chargeable on consumer contracts with Pennsylvania citizens.  Indeed, the Third Circuit's specific focus in *Kaneff* was Pennsylvania's usury policy in voiding the arbitration provision because the plaintiff argued that the usurious terms of the loan itself would make the arbitration agreement substantively unconscionable under Pennsylvania law.  As the Court explicitly stated, "we *do* consider the usury issue as part and parcel of whether the arbitration clause should be enforced. The choice of law analysis cannot be divorced from that issue." *Kaneff*, 587 F.3d at 622 (emphasis added).  As previously noted by a member of this bench, "[a]ccordingly, the Court's choice of law

4

analysis is not only persuasive—it has precedential effect." *Gregoria v. Total Asset Recovery, Inc.*, CIV.A. 12-4315, 2015 WL 115501, at *4 n.6 (E.D. Pa. Jan. 7, 2015) (Stengel, J.).

Defendants seek to go around *Kaneff*, asking me to ignore it and find instead that the Commerce Clause of the United States Constitution renders any application of the Restatement (Second) of Conflict of Laws § 187(2) unconstitutional. Specifically, Defendants ground their argument in a particularly expansive view of the dormant Commerce Clause advanced by Judge Posner of the Seventh Circuit in *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), a view which does not appear to enjoy broad support. I am not persuaded that *Midwest Title* represents a sound approach to the dormant Commerce Clause, and in any event, it does not provide a basis to depart from the Third Circuit's controlling precedent.

The dormant Commerce Clause is a judicially created doctrine based upon an inference that the Commerce Clause's positive expression of Congress's power to regulate interstate commerce further implies a prohibition against the power of states to pass laws that infringe upon Congress's express authority. It first arose in *dicta* from Justice Marshall in *Gibbons v. Ogden*, 22 U.S. 1, 209-11 (1824), a case that otherwise appears to stand for the well-established proposition that the Supremacy Clause may require preemption of state laws where Congress has legislated. But Marshall's use of the adjective "dormant" ultimately led to a long line of cases seeking to balance "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335–36 (1989).

Much of the case law invoking the dormant Commerce Clause is aimed at economic protectionism and discrimination among the states, leading the Supreme Court to adopt a *per se*

5

rule to strike down expressly discriminatory state regulations. Where a state regulation is not expressly discriminatory, the Court has applied a balancing test: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Following *Pike*, the Third Circuit addressed whether Pennsylvania's attorney general could enforce Pennsylvania "consumer credit law to … Illinois contracts performed entirely outside Pennsylvania and in interstate commerce" under the Commerce Clause. *Aldens, Inc. v. Packel*, 524 F.2d 38, 42 (3d Cir. 1975). After dismissing arguments that state usury laws were preempted or discriminatory, the Third Circuit refused to hold that Pennsylvania usury laws were a burden on interstate commerce. It framed the question by noting that "[t]he burden on interstate commerce does not depend upon the happenstance of respective locations of buyer and seller. The fundamental issue is whether the national interest in the free movement of money, credit, goods and services outweighs the valid local interest in restricting maximum interest rates on consumer 'loans' and setting uniform contract terms for such transactions." 524 F.2d at 47–48. The *Aldens* Court then deferred to Congress on the question of burden, noting that, "despite the burden on commerce," Congress has permitted states to "enact varying usury laws and varying contract laws," and therefore "any judgment that the present proliferation of regulations of consumer credit transactions has burdened commerce unduly must be made by Congress." *Id.* at 48–49. Congress's decision in the Truth-in-Lending Act to defer to the states "on the matter of maximum interest rates" evinces Congress's judgment that there is no such burden in this field.

Defendants seek to avoid *Aldens* in the same way they seek to avoid *Kaneff,* suggesting that later cases involving the dormant Commerce Clause call it into question, again relying on

6

*Midwest Title.* There, Judge Posner placed great emphasis on *Healy v. Beer Institute*, where the Supreme Court struck down a Connecticut law setting price controls for beer. 491 U.S. 324 (1989). Those controls placed restraints upon out of state beer distributors selling into Connecticut that were tied to the price of beer in neighboring states. *Id.* at 326. The Court's express holding was that the pricing scheme violated the Commerce Clause because in practical terms it regulated the prices that beer distributors would have to set outside Connecticut.[1] Consistent with earlier decisions, it observed that the Commerce Clause limits state laws that regulate "commerce occurring wholly outside the boundaries of a State." *Id.* at 336. In a later case, *PhRMA v. Walsh*, 538 U.S. 644, 669 (2003) the Court refused to apply *Healy* to Maine's prescription purchasing statute because "Maine is not tying the price of its in-state products to out-of-state prices." It underscored the basis for its decision in *Healy*, quoting an earlier opinion by Justice Cardozo holding that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935)).

In *Healy,* the Court explicitly categorized the case as one involving "price-affirmation statutes." 491 U.S. at 331. Courts that have since considered the meaning of *Healy* have generally adhered to this narrow interpretation, given the emphasis on protecting against discriminatory

---

[1] *Healy* is replete with *dicta,* but its holding is consistent with an earlier decision striking down a similar statute, *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986). There the Court found that a state price-regulation statute that effectively regulated the price to be paid in other states violated the Commerce Clause because "[w]hile a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess." *Cf. Healy*, 491 U.S. at 339 ("The Connecticut statute, like the New York law struck down in *Brown–Forman,* requires out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions."). In *American Express v. Sidamon-Eristoff,* 669 F.3d 359, 373 (3d Cir. 2012), the Third Circuit summarized the holding in *Healy* by quoting the relevant language from *Brown-Forman.*

7

regulations in cases applying the Commerce Clause. *See Energy and Env. Leg. Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015) (Gorsuch, J.) (treating the *Healy* line of cases as suggesting "a concern with preventing discrimination against out-of-state rivals or consumers" and refusing to apply them where the statute "isn't a price control statute, it doesn't link prices paid in Colorado with those paid out of state, and it does not discriminate against out-of-staters"); *Assn. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013) ("*Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices."); *see also Online Merchants Guild v. Cameron*, 995 F.3d 540, 559 (6th Cir. 2021) (Kentucky emergency supply price gouging laws enforced against sellers on Amazon market place did not violate *Healy*'s extraterritoriality prohibition because it did not have the inevitable effect of setting prices to other consumers); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007) ("SPGGC fails to allege any facts tending to show … how the effects of the Gift Card Law might be projected into other state. … Unlike the price-affirmation laws in *Healy* and *Brown–Forman*, the Gift Card Law does not, by its terms or effects, directly regulate sales of gift cards in other states.").

The Third Circuit has similarly restricted its application of *Healy*. It has done so because of the well-established rule that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 766–67 (1945). *American Express v. Sidamon-Eristoff,* 669 F.3d 359, 373 (3d Cir. 2012) is perhaps the clearest expression of the Third Circuit's view. There, it interpreted *Healy* as holding that "States may not deprive businesses and consumers in other States of whatever competitive advantages they may possess based on the

8

conditions of the local market." *Id.* (quoting *Healy*, 491 U.S. at 339). *Sidamon-Eristoff* concerned a New Jersey statute that modified the abandonment period for travelers' checks. American Express brought a Commerce Clause challenge arguing that the law potentially required it to raise prices for travelers checks in other states to compensate for losses that flowed from the change in the law. *Id.* at 373-74. The Court of Appeals found no constitutional violation arising out of any costs of compliance measures that the company might adopt, despite Amex's argument that they could potentially affect prices in other states. Similarly, here, Pennsylvania's usury laws do not directly regulate TitleMax's sales of loans to residents of other states, do not force TitleMax to "conform its out-of-state practices to less favorable in-state conditions," or do anything to "prevent[] other states from regulating [consumer loan products] differently … ." *Id.* 373.

Prior to *Sidamon-Eristoff*, the Third Circuit had addressed *Healy* in two cases involving state securities laws. In both cases, it explicitly discussed how the conflict of laws doctrine and the dormant Commerce Clause interact. *Instructional Sys. Inc. v. Computer Curriculum Corp.* involved a contract between parties from multiple states. 35 F.3d 813 (3d Cir. 1994). One of the contracting parties objected to the application of New Jersey law under the Commerce Clause. The Third Circuit found the objection without merit, recognizing that "it is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects," and further observing that "[w]hile a contract which covers multiple states may raise a difficult choice-of-law question, once that question is resolved there is nothing untoward about applying one state's law to the entire contract, even if it requires applying that state's law to activities outside the state." 35 F.3d at 825.

In a similar case, *A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities*, 163 F.3d 780, 787 (3d Cir. 1999), the Third Circuit noted an evolution in the law of contracts following the development of the modern economy and the increasing prevalence of contracts involving parties

from different states. It recognized a shift away from treating contracts as "being rooted in a single geographical location, such as the place the offer was accepted," to "the contrasting modern approach … to recognize that contracts formed between citizens in different states implicate the regulatory interests of both states." *Id.* at 787. Turning to the facts of the case, the Court concluded that "[a] contract between Goldmen in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur 'wholly outside' New York. Rather, elements of the transaction occur in each state, and each state has an interest in regulating the aspect of the transaction that occurs within its boundaries." *Id.* The *Goldmen* Court observed that the power to regulate securities transactions "is one that most states have long exercised, and that Congress has for decades expressly allowed to continue. This is not the sort of 'parochial' state power that Justice Cardozo warned of in *Baldwin,* the broad exercise of which 'would … invite a speedy end of our national solidarity.'" *Id.* at 789 (quoting *Baldwin*, 294 U.S. at 523). Similarly, here, the contract with Titlemax did not "occur" wholly within the state of Delaware or wholly outside of Pennsylvania, and states have long regulated rates of interest through the enactment of usury laws.

Despite the relevant precedent discussed above, Defendants would have me follow *Midwest Title,* where the court relied upon *Healy* to sustain a Commerce Clause challenge to the enforcement of an Indiana usury statute against Illinois auto title lenders. 593 F.3d 660 (7th Cir. 2010). *Midwest Title* is both inconsistent with decisions of the Third Circuit and unpersuasive in its own right. The opinion purports to recognize that the Supreme Court's concern in *Healy* was that the statute in question had the practical effect of regulating prices in other states, 593 F.3d at 666, but then ventures far afield with a series of hypotheticals and reflections on facts that are not apparent from any of the pleadings cited. *Midwest Title* rejects both the Third Circuit's opinion in

*Instructional Systems, Inc.,* and the First Circuit's opinion in *PhARM v. Concannon*, 249 F.3d 66 (1st Cir. 2001), with no mention that the First Circuit was affirmed by the Supreme Court in *PhARM v. Walsh*, 538 U.S. 644 (2003). *PhARM* has particular relevance here, because the Supreme Court expressly declined to apply *Healy* where the state was "not tying the price of its in-state products to out-of-state products." *Id.* at 669.

Besides its aggressive construction of *Healy*, *Midwest Title* is undermined by its reliance upon *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), as support for the proposition that regulation beyond a state's borders violates the Commerce Clause. *Quill* relied heavily on physical presence as an important factor but was expressly overruled a few years ago in *South Dakota v. Wayfair Inc.*, 138 S.Ct. 2080 (2018). Although cross-state, storefront based title lending presents a different problem in regulation than assessing sales taxes against online lenders, the *Wayfair* Court's concern about judicially created doctrines that limit legitimate state policies, without the input of Congress, rings true here. *See id.* at 2093-2096.

*Midwest Title* also gives insufficient weight to a state's interest in protecting its own citizens. The Supreme Court, in the context of state securities laws, has found that the dormant Commerce Clause is not applicable where a statute is principally applied to a state's own residents "whom [a state] indisputably has an interest in protecting." *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) (recognizing that the use of mails would even make transactions with in-state residents interstate commerce, but that the aspect of an Illinois securities statute that violated the commerce clause was that it would apply to shareholders "living in other States and having no connection with Illinois"). As noted by the Second Circuit, if even modest effects beyond a state's borders are enough to render regulations unlawful, "almost every state consumer protection law would be considered

11

'protectionist' in a sense prohibited by the Constitution. The meaning of the dormant Commerce Clause is far narrower." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007).

In this case, the state usury laws that the Pennsylvania litigant seeks relief under are not being applied to any of TitleMax's loans made to non-Pennsylvania citizens, nor does the putative "price" setting on the loans made to the Pennsylvania consumers have any direct effect on how TitleMax can set its prices for loans to residents of other states.

Defendants also rely upon *TitleMax of Delaware, Inc. v. Weissmann*, 505 F. Supp. 3d 353, 359-60 (D. Del. 2020), which held that the Pennsylvania Department of Banking and Securities could not pursue investigative subpoenas issued to TitleMax in Delaware. As an initial matter, *Weissman* is distinguishable. When a governmental entity in one state seeks to extend its power to another state, more profound issues of interstate sovereignty are raised than in a contract action between private parties. [2] Beyond that, the persuasive of authority of *Weissman* is significantly limited by the cursory nature of the analysis. The court assumed, without explanation, that *Midwest Title* provided the controlling standard, with no reference to any Third Circuit precedent or any of the Commerce Clause decisions from the Supreme Court. And the principal point *Weissman* extracted from *Midwest Title* was its focus on extraterritoriality, even though the precedent on which *Midwest Title* relied was subsequently overruled. For these reasons, I decline to follow *Weissman*.

In conclusion, *Kaneff* controls this action, and the claims against Titlemax will not be dismissed.

---

[2] It is worth noting that *Midwest Title* was a declaratory judgment action brought against the state, rather than a private contract action as here.

B. <u>The Claims Against Defendant Young Are Dismissed</u>

Plaintiff alleges that Defendant Young, who is the President and CEO of TitleMax, is liable for the usurious title loans at issue under 18 U.S.C. § 1962(c). His theory is that Young conducted or participated in the affairs of TitleMax, allegedly a racketeering enterprise, in its collection of unlawful debt from Pennsylvania citizen-borrowers. Defendants argue that Plaintiff has failed to plead sufficient facts to establish that Defendant Young has the minimum contacts with Pennsylvania necessary for the Court to establish personal jurisdiction. They further argue that Plaintiff hasn't sufficiently pleaded Young's personal involvement in TitleMax's collection of illegal debt from Pennsylvania consumers. I agree with the defense that the allegations against Young are cursory and conclusory as pleaded. "A claim that relies just on 'conclusory statements' … without supporting factual allegations, does not establish plausible grounds for relief." *Beasley v. Howard*, 14 F.4th 226, 231 (3d Cir. 2021). Plaintiff's allegations suggest Young's involvement in the alleged racketeering in Pennsylvania solely on the basis of Young's role as an officer of TitleMax of Delaware and its parent company TMX Finance, LLC. Compl. ¶¶ 3-4, 51-54. It may be that further discovery will show that Young has in fact participated in the decision making, direction, or operation of the allegedly usurious lending at issue here. *See, e.g., Pennsylvania v. Think Finance, Inc.*, 14-CV-7139, 2016 WL 183289, at *16 (E.D. Pa. Jan. 14, 2016) (upholding state RICO claims against out-of-state CEO who made statements about usurious lending programs). At this stage, however, Plaintiff's conclusory statements are not enough to sustain the claim against Defendant Young. I will therefore dismiss this claim, albeit without prejudice.

C. <u>The Truth-in-Lending Claims Are Sufficiently Pleaded</u>

Plaintiff's claims under TILA involve three legal theories: (1) that the TitleMax employee's alleged use of the computer in the application process screened the Plaintiff from

viewing the disclosures mandated by 12 C.F.R. § 1026.17; (2) that the disclosures in the loan agreement did not actually reflect the legal obligations of the parties; and (3) that Plaintiff never consented to receiving the TILA disclosures electronically. Plaintiff has pleaded sufficient facts to sustain this claim at the present stage of litigation.

### IV. Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh<br>
United States District Judge